Scott A. McMillan, SBN 212506
Michelle D. Volk, SBN 217151
Sean E. Smith, SBN 288973
**THE MCMILLAN LAW FIRM, APC**
4670 Nebo Dr., Suite 200
La Mesa, CA 91941-5230
Tel. 619-464-1500 x 14
Fax. 206-600-5095

Attorneys for Petitioner,
Lycurgan, Inc.

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| In the Matter of the Search of: | CASE NO. 14-CV-1424 JLS (BGS) |
|---|---|
| Ares Armor, 206/208 N Freeman St, Oceanside; Ares Armor, 416 National City Blvd; Ares Armor Warehouse, 180 Roymar St D; and 2420 Industry, Oceanside, CA | **PETITIONER LYCURGAN, INC.'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION FOR A NEW TRIAL OR FURTHER ACTION FROM THE COURT ON THE JUDGMENT** |
| LYCURGAN, INC. d/b/a ARES ARMOR, Petitioner, vs. BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES, Respondent. | Judge: Hon. Janis L. Sammartino Dept.: 4A Date: October 30, 2014 Time: 1:30 P.M. |

Petitioner LYCURGAN, INC. respectfully requests that this Court to take judicial notice of the following document(s) pursuant to Federal Rules of Evidence, Rule 201:

1. JUDGMENT IN A CIVIL CASE, Civil Action No. 14-cv-01424-JLS-BGS, United States District Court, Southern District of California, filed on August 21, 2014. A true and correct copy of the Judgment is attached hereto as **Exhibit "A."**

2. ORDER SEALING SEARCH WARRANT, APPLICATION AND AFFIDAVIT FOR SEARCH WARRANT, AND THIS SEALING ORDER, Civil Action No. 14-cv-01424-JLS-BGS, United States District Court, Southern District of California, filed on March 17, 2014. A true and correct copy of the search warrant affidavit is attached hereto as **Exhibit "B."**

Respectfully submitted:

THE McMILLAN LAW FIRM, APC

DATED: September 16, 2014

/s/ Scott A. McMillan

Scott A. McMillan
Attorney for Petitioner
Lycurgan, Inc.

# EXHIBIT A



# United States District Court

## SOUTHERN DISTRICT OF CALIFORNIA

Lycurgan, Inc.

                            **Plaintiff,**

                **V.**

Ares Armor et al

                          **Defendant.**

**Civil Action No.**  14-cv-01424-JLS-BGS

## JUDGMENT IN A CIVIL CASE

**Decision by Court.**  This action came to trial or hearing before the Court.  The issues have been tried or heard and a decision has been rendered.

IT IS HEREBY ORDERED AND ADJUDGED:

The Court Denies as Moot Petitioner's Motion to Unseal Search Warrant Documents.

**Date:**       8/21/14

**CLERK OF COURT**
**JOHN MORRILL, Clerk of Court**
By:  s/ S. Tweedle

                       S. Tweedle, Deputy

# EXHIBIT B





FILED

MAR 1 7 2014

CLERK U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

1

2  **UNITED STATES DISTRICT COURT**

3  **SOUTHERN DISTRICT OF CALIFORNIA**

'14EJ0962

4  IN THE MATTER OF A SEARCH OF              ORDER SEALING SEARCH WARRANT,
                                            APPLICATION AND AFFIDAVIT FOR
5  Ares Armor, 206/208 N Freeman St,        SEARCH WARRANT, AND THIS
   Oceanside; Ares Armor, 416 National City SEALING ORDER
6  Blvd; Ares Armor Warehouse, 180 Roymar
   St D; and 2420 Industry, Oceanside,CA    Case No. _____
7

8         Upon motion of the UNITED STATES OF AMERICA and good cause appearing, a

9  continuing criminal investigation;

10        IT IS HEREBY ORDERED that the Affidavit of ▨▨▨▨▨▨▨▨ in support of the Search

11 Warrant, the Application, the Search Warrant, and this order be sealed until further order of this Court.

12

13 DATED: _3/17/14_

14

15

16                                  THE HONORABLE BERNARD G. SKOMAL
                                    United States Magistrate Judge
17                                  United States District Court for the Southern District of
                                    California
18

19

20

21

22

23

24

25

26

27

28

AO 106 (Rev. 06/09) Application for a Search Warrant

# UNITED STATES DISTRICT COURT



for the

Southern District of California

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* ) Case No.
)
various physical addresses associated with )
Ares Armor )

**'14MJ0962**

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A(1), A(2), A(3), A(4)

located in the _____ Southern _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized):*
See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 18 USC 922(a)(1)(A), 922(t), and 371 | 18 U.S.C. §922(a)(1)(A) (unlawful to deal firearms without a license); 18 U.S.C. § 922 (t)(1) (failure to conduct background checks during firearms transfer); and 18 U.S.C. §371 (conspiracy to commit the foregoing offenses) |

The application is based on these facts:

See Attached Affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.



_____
*SA ATF*
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 3/14/14



_____
*Judge's signature*

Bernard Skomal
*Printed name and title*

City and state:

I, ▓▓▓▓▓▓▓▓ being duly sworn, hereby depose and state as follows:

## I.     INTRODUCTION AND EXPERTISE

1.     I am a Special Agent ("SA") with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), United States Department of Justice, and have been so employed since May 2009. I am a graduate of the Federal Law Enforcement Training Center and the ATF National Academy. I am currently assigned to the San Diego IV, California Field Office.

2.     As a result of my training and experience as an ATF Special Agent, I am familiar with both federal and state criminal laws. My primary duties include the enforcement of federal firearms and explosives laws. I have participated in investigations involving the possession of firearms by prohibited persons, the possession of illegal firearms, and the illegal acquisition of firearms by both prohibited and non-prohibited persons. I also have participated in investigations involving the possession and distribution of illegal narcotics. I have personally participated in the preparation and execution of search warrants involving various violations of federal and state laws.

3.     I have received approximately 28 weeks of training at both the Federal Law Enforcement Training Center and the ATF National Academy in Glynco, Georgia, and numerous hours of post academy training.

## II.     PURPOSE OF AFFIDAVIT

4.     This affidavit supports an application for a warrant authorizing the search of (1) the storefront / premises of Ares Armor Oceanside Branch, 206/208 North Freeman Street, Oceanside California, 92054, ("TARGET LOCATION-1"), more fully described in Attachment (A)(1); (2) storefront / premises of Ares Armor National City Branch located at 416 National City Boulevard, National City, California ("TARGET LOCATION-2"), more fully described in Attachment (A)(2); (3) Ares Armor warehouse location located at 180 Roymar Street, Suite D, Oceanside California, 92058 ("TARGET LOCATION-3"), more fully described in Attachment (A)(3), and 2420 Industry,

1

Oceanside, CA ("TARGET LOCATION-4") more fully described in Attachment (A)(4) (collectively, the "TARGET LOCATIONS").

5.　　I submit that the facts contained in the paragraphs below demonstrate that there is probable cause to believe that fruits, instrumentalities, and evidence, more fully described in Attachment (B) of this affidavit, violations of 18 U.S.C. §922(a)(1)(A) (unlawful to deal firearms without a license); 18 U.S.C. § 922 (t)(1) (failure to conduct background checks during firearms transfer); and 18 U.S.C. §371 (conspiracy to commit the foregoing offenses) will be found at the TARGET LOCATIONS.

6.　　I make this affidavit, in part, based on personal knowledge derived from my participation in this investigation and, in part, based upon information from the following sources:

a.　　Oral and written reports about this investigation and other related investigations that I have received from federal and state law enforcement officers;

b.　　Physical surveillance conducted by federal agents or local law enforcement officers, which observations have been reported to me either directly or indirectly;

c.　　Queries of law enforcement records and intelligence data bases.

7.　　Except where otherwise noted, the information set forth in this affidavit has been provided to me directly or indirectly by ATF Special Agents or other law enforcement officers. Unless otherwise noted, wherever in this affidavit I assert that a statement was made, the information was provided by another law enforcement officer (who may have had either direct or hearsay knowledge of the statement) to whom I have spoken or whose report I have read and reviewed. Such statements are among many statements made by others and are stated in substance, unless otherwise indicated. Similarly, information resulting from surveillance, except where indicated, does not set forth my personal observations but rather has been provided directly or indirectly by other law enforcement officers who conducted such surveillance.

2

8.    Because this affidavit is being submitted for the limited purpose of seeking authorization for warrants to search the TARGET LOCATIONS, I have not set forth each and every fact learned during the course of this investigation. Rather, I have set forth only the facts that I believe are necessary to establish the foundation for an order authorizing the requested warrant.

## III.    TECHNICAL BACKGROUND INFORMATION

*Definition of a "Firearm"*

9.    A "firearm" is "any weapon . . . which will or is designed to or may readily be converted to expel a projectile by the action of an explosive." 18 U.S.C. §921(a)(3)(A). This definition includes "the frame or receiver of any such weapon," 18 U.S.C. §921(a)(3)(B), and "any combination of parts either designed or intended" from which a firearm can be "readily assembled." 18 U.S.C. §921(a)(4)(C). A "receiver" under 18 U.S.C. §921(a)(3)(B) includes a "lower receiver."

*The AR-15 Platform*

10.    An AR-15 is the semi-automatic, civilian-version of the .223-caliber M16 machine gun used by the United States military. Although AR-15 refers to the model produced by Colt (firearms manufacturer), the term "AR-15" is colloquially used to refer to firearms similar to, and based upon, the Colt AR-15. An example of an AR-15-style rifle is depicted below. This image is from ATF's "Police Officer's Guide to Recovered Firearms," accessible at

http://www.atf.gov/files/publications/download/p/atf-p-3312- 12.pdf.

3



*Photo 1 - AR-15 rifle (photo unrelated to this case)*

11.    An AR-15-style rifle consists of many parts. There are five parts that will be discussed at length in this Affidavit: the (1) lower receiver; (2) upper receiver; (3) stock; (4) barrel; and (5) magazine. These parts are labeled below.



*Photo 2 - AR-15 rifle (labeled) (photo unrelated to this case)*

4

12.     Depicted below is a firearm that has been disassembled to isolate the parts



*Photo 3 - AR-15 rifle (disassembled) (photo unrelated to this case)*

13.     Generally, most parts for a firearm (e.g. stocks, barrels, magazines) are not subject to domestic firearms licensing regulation by ATF. Accordingly, these parts are often made by individuals and small businesses. For the most part, these gun parts can be bought and sold without reporting the sales and without requiring a background check.

14.     The lower receiver is different than common gun parts. As discussed in Paragraph 9 above, a lower receiver is considered a "firearm." That means that the lower receiver, without any other parts at all, is regulated and controlled by ATF the same way as a completed firearm (for example, the AR-15-style rifle depicted above). This also means that the manufacture, sale, transfer, and disposition of lower receivers are regulated by ATF. Depicted below is a lower receiver for an AR-15-style rifle.

5



*Photo 4 – AR-15 lower receiver (photo unrelated to this case)*



15.    The commercial firearms industry has coined several terms such as "blank", "an 80%," "an 80%

blank," "an 80% lower," "casting" or "an AR-15 80%." These terms developed based on the perception

that the piece of aluminum, metal or polymer was 80% of a firearm, and therefore unregulated by ATF.

The term "80%" and variations of it are not used by ATF and are not officially recognized by ATF.  For

ease of communication, the items described above will be referred to hereafter as AR-15 variant lower

receivers or simply variant lower receivers.

16.     In the case of this investigation, manufacturers are creating Kevlar reinforced polymer variant lower receivers with certain cavities filled by different colored polymer (see paragraph 18 for additional details). These variant lower receivers are made functional through the use of specialized tools, typically a drill press or a hand drill, a Dremel tool (a versatile, handheld rotary bit tool that can be used to cut, grind, drill, sand, and mill various materials), and other various types of milling equipment. These are all fairly simple and affordable hand tools that can be obtained and operated by nearly anyone. They are readily available at most hardware/home improvement stores.

17.     Using either a drill press or a hand drill, the equipment operator drills, cuts, or mills cavities in specific locations on the AR-15 variant lower receiver. Compare the AR-15 variant lower receiver depicted below left with the AR-15 lower receiver depicted below right. This process transforms the AR-15 variant lower receiver into an AR-15 lower receiver by creating the precise shape and space necessary for the lower receiver to accept the parts that will allow the firing of a projectile. These shapes or cavities must be created to the exact specifications required. If these cavities are not formed to the exact specifications required, the firearm will not function and may break. This process also creates the holes necessary to attach the upper receiver and barrel to the lower receiver. These parts (e.g. the hammer, bolt or breechlock, and firing mechanism) are the internal mechanical parts, that combine with a trigger, firing pin, and other parts to form a functioning firearm.

7



AR-15 variant
lower receiver
prior to milling

AR-15 variant
lower receiver
after milling, now
classified as a
firearm

*Photo5 - (clockwise from top left) AR-15 variant lower receiver, AR-15 lower receiver*
*AR-15 lower receiver (top view) (photos unrelated to this case)*

18.     This investigation deals with the manufacturing of AR-15 variant lower receivers that
are designed of Kevlar reinforced polymer. The polymer products in this case are molded during the
manufacturing process. During the molding process, the manufacturer has created the material in the fire
control cavity (further referred to as the plug) a different color than that of the main body of the receiver.
This difference in color enables the customer to easily identify how much material to mill away thereby
creating the specific and exact cavities that are necessary to enable the weapon to function properly.

19.     ATF Firearms Technology Branch (FTB) provides expert technical support to ATF,
other Federal agencies, State and local law enforcement, the firearms industry, Congress, and the general
public. They are the office within the ATF that examines and classifies firearms in accordance with the
definition provided in 18 U.S.C. § 921 (a)(3). FTB Enforcement Officer ▇▇▇▇▇▇▇ has reviewed
AR-15 variant lower receivers from EP Arms, LLC and determined that the material that comprises the
main body of the variant lower receiver is formed at a different time in the manufacturing process than
that which comprises the plug. As a result of the two plastics being poured at two different times, the

8

receiver and plug being are formed in such a way that they are not adhered to each other. As such, the plug can be removed and the firearm can readily be placed into a firing condition. Additionally, the fact that two different plastics having two different colors and/ or an easily defined seam; results in the indexing of the fire-control-cavity. ATF has consistently held that the indexing of the fire-control-cavity of the AR-type receiver (or any of the mounting pin holes for the fire-control-components) is the same as if it were formed, and thus, constitutes the making of a firearm frame or receiver as defined by 18 U.S.C. §921(a)(3)(A).

20.     Unlike a firearm manufactured by a licensed manufacturer, these firearms are completely untraceable. They have no serial number. They have no manufacturer identification.

21.     Technical Reference: ATF Firearms Technology Branch. (November 1, 2013). Unfinished "80%" AR-15 Type Receivers. In *Technical Bulletin 14-01*.

## IV.     PROBABLE CAUSE

### A. BACKGROUND OF INVESTIGATION

22.     On July 24, 2013, the ATF Firearms Technology Branch (FTB) received an AR-15 variant lower receiver exemplar from Jason Davis, the attorney representing EP Armory, LLC (EPA). The FTB is the department within the ATF that examines and classifies firearms in accordance with the definition provided in 18 U.S.C. § 921 (a)(3). The exemplar that was provided was a polymer based product that had a cavity in the fire control region which was filled with a different color polymer.

23.     On February 13, 2014, a determination letter was delivered from FTB to Jason Davis, the attorney representing EP Armory, LLC, and Ares Armor. The letter indicated that the lower receivers/AR-15 variant lower receivers that are being sold by EP Armory were classified as firearms as defined by 18 U.S.C. § 921 (a)(3).

24.     On March 7, 2014, ATF Special Agents served a search warrant at EP Armory, pursuant to warrant no: 5:14-sw-00013-JLT, obtained in the Federal District Court, Eastern District of California,

9

from United States Magistrate Judge the Honorable Jennifer L. Thurston. Business records retained from this search warrant indicated that ARES ARMOR was a dealer of AR-15 variant lower receivers for EP Armory. These records indicated that ARES ARMOR had been purchasing "variant lower receivers" that were identified by EP Armory's product name "EP80". EP Armory received payment from ARES ARMOR by means of checks that had the business name "LYCURGAN" the parent company of ARES ARMOR. The accounts billing address was listed as, 208 N. Freeman St. Oceanside, CA, 92054-2919, which is the same address as the ARES ARMOR storefront location in Oceanside ("TARGET LOCATION-1").

25.     Additional examination of the business records indicated that on December 23, 2013, EP Armory received a payment in the amount of $41,875.00 for the purchase of 1,700 "EP80" variant casting lowers. On January 29, 2014, EP Armory received a payment in the amount of $58,125.00 for the purchase of 2,325 "EP80" variant casting lowers. Finally on February 26, 2014, EP Armory received a payment in the amount of $100,010.00 for the purchase of 4,000 "EP80" variant casting lowers.

26.     Continuing on March 7, 2014, ATF Los Angeles Field Divison Paul Ware spoke with Jason Davis, the attorney for EP Armory and Ares Armor. Jason Davis stated that he had reviewed the FTB determination regarding the variant lower receivers and believed the document was created in error. Counsel Ware advised Jason Davis that despite his opinion, ATF determined that the variant lower receivers were, in fact, firearms. In response, Davis stated that he would have all of his clients remove the polymer variant lower receivers from their shelves and advise them to no longer sell them.

27.     On March 10, 2014, Division Counsel Ware contacted Jason Davis, and advised him again that ATF had determined that the "EP80" polymer variant lower receiver were, in fact, firearms. Counsel Ware further advised Jason Davis, that his other client ARES ARMOR, was currently in possession of the "EP80" polymer variant lower receivers in violation of federal law. Jason Davis indicated that he understood the violation, and stated that he would speak to his client and get back to

10

Division Counsel Ware.

28.    Continuing on this same date, Jason Davis, the attorney for ARES ARMOR contacted Division Counsel Ware and arranged for the ATF San Diego IV Field Office to accept the forfeiture of the "EP80" variant lower receivers, in lieu of seeking a search/seizure warrant. Division Counsel Ware emphasized to Jason Davis that in addition to the "EP80" variant lower receivers, he would also require the sales records for any "EP80" variant lower receivers ARES ARMOR had previously sold. Jason Davis told Division Counsel Ware, that ARES ARMOR would surrender an estimated 4000 polymer variant lower receivers, along with the names and contact information of the customers who had previously purchased them. Jason Davis advised that the point of contact at ARES ARMOR was "Dimitri", and provided his phone number,

29.    On March 11, 2014, ATF Special Agent ████████ called the phone number provided by Jason Davis, and spoke to Dimitri KARRAS, the owner of ARES ARMOR regarding the surrender of the polymer variant lower receivers. KARRAS told Agent ████ that he had arranged with Jason Davis that the surrender of the firearms would take place at his Oceanside store on March 12, 2014, at 11:00 a.m. KARRAS stated that he had consolidated all of his stock to one room, and he was the only person who would have access to it.

30.    On March 12, 2014, at approximately 9:30 a.m., Agent ████ again contacted KARRAS to confirm the appointment at 11:00 a.m., and to ascertain from him, the size of the vehicle that would be required to move the firearms. KARRAS informed Agent ████ that he had his attorney file a Temporary Restraining Order (TRO) against ATF. KARRAS expressed his primary concern was having to give up the customer records that ATF was requesting.

31.    Continuing on this date, Agent ████ sent an e-mail to Jason Davis, the Attorney for ARES ARMOR, requesting a copy of the TRO that KARRAS claimed had been issued. Jason Davis subsequently responded via e-mail that he was no longer representing ARES ARMOR on this matter. Jason Davis indicated that the Attorney handling the TRO was an individual named Alan Beck.

11

32.     Continuing on this date, at approximately 1:15 p.m., Agent ▓▓▓▓ placed a phone call to Alan Beck. He identified himself to Beck and explained that he was handling the recovery of the firearms from ARES ARMOR. Agent ▓▓▓▓ also asked Beck if he had filed a Temporary Restraining Order against ATF. Beck responded that he had, and that he would be willing to provide a copy of the order to ATF. After exchanging e-mails, Agent ▓▓▓▓ received a copy of the restraining order from Beck. Specifically, Judge Sammartino ordered "that any steps to deprive Ares Armor of the Property SHALL NOT be executed until after the Court holds a hearing...." See 14-CV-548-JLS-BGS, Doc. No. 4 (emphasis in original).

33.     Continuing on this date, at approximately 3:00 p.m., Agent ▓▓▓▓ placed a call to KARRAS, and asked him if he would be amenable to having a couple of ATF agents view the location where he had indicated the lower receivers (firearms) were being stored. Agent ▓▓▓▓ explained to KARRAS, that he had the right to refuse, but ATF was concerned about the safe storage of the items until the matter regarding the TRO could be resolved. KARRAS stated the Agents were welcome to stop by, and he would show them the storage location.

34.     Continuing on this date, ATF Special Agent (SA) ▓▓▓▓, and ATF Resident Agent in Charge (RAC) ▓▓▓▓ met with KARRAS at the Oceanside Branch of ARES ARMOR. SA ▓▓▓▓ contacted KARRAS via cellular telephone prior to SA ▓▓▓▓ and SA ▓▓▓▓ arrival at Ares Armor to confirm the meeting. KARRAS advised he was still at 208 N. Freeman St., Oceanside.

35.     SA ▓▓▓▓ and SA ▓▓▓▓ then contacted KARRAS who identified himself as the CEO of Ares Armor at 208 N. Freeman St., Oceanside, CA. KARRAS further informed SA ▓▓▓▓ and RAC ▓▓▓▓ that Ares Armor had expanded to 206 N. Freeman St., Oceanside, CA, in addition to 208 N. Freeman St. (TARGET LOCATION-1) On March 14, 2014, SA ▓▓▓▓ observed a sign posted at 208 N. Freeman St. with an arrow pointing to 206 N. Freemen St., which stated that the business had moved. Ares Armor decals were affixed to the storefront located at 206 N. Freeman St.

36.     SA          informed KARRAS that the EP Armory lower receivers were considered firearms. Since Ares Armor did not have a Federal Firearms License (FFL), Ares Armor was not authorized to possess or transfer the EP Armory lower receivers. KARRAS agreed that Ares Armor did not have an FFL. KARRAS disagreed that the EP Armory lowers should be considered firearms. This disagreement was one of the reasons he obtained a Temporary Restraining Order (TRO) against ATF, in addition to that fact that KARRAS did not want to voluntarily provide the EP Armory list of purchasers to ATF. SA          explained to KARRAS that one of ATF's concerns was that since the EP Armory lower receivers were not sold as firearms, no background checks were conducted (neither state nor federal) on the individual purchasers of the EP Armory lower receivers. As a result, these firearms were potentially in the possession of convicted felons and other prohibited persons, which presented a potential threat to public safety. In response, KARRAS stated that the EP Armory lower receivers were in a secure location and offered to show SA          and SA          how KARRAS had secured the EP Armory lower receivers.

37.     SA          and SA          followed KARRAS to 180 Roymar Street, Suite D, Oceanside, CA, which was a warehouse location for Ares Armor. (TARGET LOCATION-3). KARRAS informed SA          and SA          that he became aware last week that the EP Armory lower receivers were considered firearms. As a result, KARRAS pulled the entire inventory from all Ares Armor branch locations and consolidated them in a room just to the right of the main entrance at 180 Roymar St. Additionally, KARRAS had placed a hard copy of the list of customers who purchased the EP lower receivers in the room. SA          observed a stack of paper in the top right corner which KARRAS identified as the customer list. The room was in the process of being re-keyed.

38.     On March 13 and 14, 2014, queries were conducted in the ATF Federal Licensing System database which maintains Federal Firearms Licensee records and applications. Search results indicated that no individual or entity/ corporation had ever been licensed or requested a license in relation to the

13

following search terms: "Lycurgan", "Ares Armor", "Karras", "206 N Freeman", "208 N Freeman", "180 Roymar", "2420 Industry" or "416 National City".

39.    On March 14, 2014, SA        observed an individual wearing a black shirt with the Ares Armor logo and black pants enter into the second door from west of 2420 Industry, Oceanside, CA. SA        is aware that Ares Armor Metal Works LLC was previously located at 2420 Industry, Oceanside, CA. (TARGET LOCATION-4). In addition, a gray pick-up truck with CA license plate 7T34665 had a large Ares Armor decal on the back window of the camper shell. A search of California DMV records indicate that this vehicle belongs to Jeremy Tuna. A searched of the website LinkedIn identified Jeremy Tuna as COO for Ares Armor. Later on March 14, 2014, SA        observed an older model Subaru with AZ license plate ADC9713 parked directly in front of 2424 Industry. SA        recognized the vehicle as one similar to one driven by Jonathan Zummallen on March 12, 2014. A search of Arizona DMV records showed that the vehicle was registered to Jonathan Zummallen who was involved in the meeting with SA        , RAC        and Karras on March 12, 2014.

40.    On March 13, 2014, SA        conducted a search of the internet for Ares Armor, National City, CA. SA        viewed the Ares Armor website at www.aresarmor.com which listed a store in National City at 416 National City Blvd, National City, CA. (TARGET LOCATION-2) On March 14, 2014, ATF SA        observed the building located at 416 National City Blvd. The building is a duplex in which the southern storefront has Ares Armor logo decal affixed to the store front. In addition, there is a billboard above the building which has a picture of an AR-15 variant rifle "Ares Armor" and "Unserialized. No Registration. Legal" written on the billboard.

41.    On March 14, 2014, at approximately 2:00 p.m., Judge Sammartino issued an order that states, in relevant part:

(1) Plaintiff Lycurgan Inc. DBA Ares Armor ("Plaintiff") and its owners, officers, managers, employees, and agents ARE HEREBY PROHIBITED from taking any steps to destroy, transfer, sell, or otherwise divest themselves of the items that are the subject matter of the Court's March 11, 2014

14

Temporary Restraining Order ("TRO") (see ECF No. 4);

(2) the Court's March 11, 2014 TRO **DOES NOT ENJOIN** lawful criminal proceedings,

including the application for or lawfully executed seizure of evidence and contraband pursuant to a

search warrant issued by a sworn United States Magistrate Judge pursuant to Federal Rule of Criminal

Procedure 41;

14-CV-548-JLS-BGS, Doc. No. 6 (emphasis in original).

## B. TRAINING AND EXPERIENCE IN FIREARM TRAFFICKING AND THE
## PROLIFERATION OF 80% RECEIVER/ VARIANT LOWER RECEIVERS

42.    A lower receiver holds the firing mechanism of a gun. The Gun Control Act of 1968

defines a completed lower receiver as a firearm, triggering a federal background check and a federal

firearms license before purchase. Individuals purchasing completed lower receivers are bound by the

same laws that regulate the purchase of "firearms."

43.    California citizens must undergo an extensive background check prior to a firearm

purchase. They must complete a Personal Firearms Eligibility Check (PFEC) conducted by the

California Department of Justice. The Department reviews state and federal data bases, to include the

National Instant Criminal Background Check System, often referred to as "NICS", to determine whether

applicants can legally possess and purchase firearms. The Department denies purchase to applicants that

have been convicted of a felony, have a history of mental illness, are addicted to narcotics, or are the

subject of a domestic violence restraining order.

44.    Only a PFEC-eligible individual may legally purchase firearms. When a PFEC-eligible

purchaser wants to obtain a specific firearm he/she must obtain a Safety Certificate and undergo a ten-

day waiting period.

45.    Because "80%" completed lower receivers are partially completed, they are not regulated

as firearms, but are considered inert hunks of metal. There is no prohibition for anyone to possess an

15

80% lower receiver or a firearm parts kit containing an 80% lower receiver. Federal law also requires that both intact guns and all completed lower receivers must be "Conspicuously engraved, cast or stamped" with a serial number to a depth of no less than .003" and a font size not less than 1/16 of an inch. Because 80% lower receivers do not constitute "complete" lower receivers, they are void of serial number and markings that would normally be required for their sale and distribution.

46.     As mentioned above, converting an 80% receiver into a "firearm" requires only basic machine work before it is ready to be used in the build of a gun. Additionally, internet videos and discussion boards provide detailed, step-by-step instructions on how to complete a firearm build. Computer Numerical Control (CNC) machine shops have also contributed to the influx of un-serialized and un-traceable firearms, by capitalizing on this market opportunity offering customers the ability to "rent" time on their equipment to complete a lower receiver. Parts required to complete the build of the firearm are not controlled items, do not require any type of background investigation, and are commercially available at gun stores and via on-line distributers. The anonymity of an 80% receiver that is converted into a firearm thereby allows individuals to obtain, use and sell weapons they would otherwise be prohibited from possessing.

47.     I know from my training, experience, and discussions with other experience law enforcement officials that firearm traffickers and/or manufacturers frequently possess the following evidence of their unlawful activity in their residences, businesses, storage units, vehicles and on their persons:

    a.    Firearms, lower receivers, upper receivers, grips, stocks, magazines, magazine repair kits, trigger assemblies, variant lower receivers, and barrels,

    b.    Information concerning where and from whom the trafficker/manufacturer purchased firearms or firearm parts,

    c.    Information concerning where and to whom the trafficker/manufacturer sold firearms

or firearm parts,

d.  Firearm records (purchase/sale, method of payment), documents related to milling of the firearms, notes or other documentation concerning profits made (i.e., comparing cost of purchase vs. cost of sale),

e.  Customer files and lists related to the services provided or firearm sales,

f.  Records and/or documents provided to customers in connection with the services provided or firearms,

g.  Correspondence to and/or from actual or prospective customers or suppliers,

h.  Records and/or documents reflecting or related to the purchase of equipment, materials, or supplies for the operation of the business,

i.  Records and/or documents of mailings, shipping or delivery, whether by the United States Postal Service or other private delivery services,

j.  Information concerning methods used to advertise the availability of their firearms or firearm parts for purchase,

k.  Photos of their firearms or firearm parts for purposes of advertising for sale, to keep track of their inventory, for insurance in case of theft, etc.

l.  Written, recorded oral, or digital communications with associates involved in the purchase/sale of firearms or firearm parts,

m.  Written statements showing profits made from the sale of firearms or firearm parts for internal purposes,

n.  Bank deposit records, checking account records, and other financial documentation showing the purchase of firearms or firearm parts, the securing of cash to purchase firearms, and the depositing of cash proceeds from the sale of firearms,

o.  Other records and/or documents which appear to be related to the business including, but not limited to notes, internal correspondence, external correspondence,

17

memoranda, directives, organizational charts,

p.  Cell phone records which show the phone number and subscriber information, and numbers called/received,

q.  Indicia of persons in control over a premises where the above items are found, including addressed mail, material in the premises with personal identification information, photographs of persons in or about the location, etc.

r.  Tools and equipment associated with the manufacture of firearms, including CNC machines, drills, drill presses, lathes, welding equipment, jigs, hack saws, power saws,

s.  Templates, diagrams, instruction manuals, pamphlets, or other tutorial material regarding the manufacture of firearms.

## V.    PROCEDURES FOR ELECTRONICALLY STORED INFORMATION

48.  With the approval of the Court in signing this warrant, Agents executing this search warrant will employ the following procedures regarding computers and other electronic storage devices, including electronic storage media, listed in Attachment A, which may contain data subject to seizure pursuant to this warrant:

a.  Based upon the foregoing, there is probable cause to believe that the computers and other electronic storage devices, listed in Attachment A, are instrumentalities of the enumerated offenses because there is probable cause to believe that they may contain contraband and fruits of crime as provided at Rule 41(c)(2), Fed R. Crim. P., or were used in committing crime as provided at Rule 41(c)(3).  Consequently, the computers and any other electronic devices are subject to seizure, retention, and possible forfeiture and destruction.  They will be taken offsite for imaging and preliminary analysis in accordance with subparagraph (b) below.

b.  The offsite imaging and preliminary analysis of computers, other electronic storage devices, and media to confirm their status as instrumentalities will be conducted within forty-five (45) days from the issuance of this warrant.  Seized items confirmed to be instrumentalities will not

18

be returned and will be further analyzed as provided below. If the preliminary analysis, by definition an incomplete or partial analysis, does not confirm that a seized item is an instrumentality, the original item will be returned promptly to its owner, absent an extension of time obtained from the owner or from the Court. An image of the items will be retained and subjected to a complete forensic analysis, as provided below.

c. Computers and other electronic storage devices and media that are retained as instrumentalities will not be returned to its owner. The owner will be provided the name and address of a responsible official to whom the owner may apply in writing for return of specific data not otherwise subject to seizure for which the owner has a specific need. The identified official or other representative of the seizing agency will reply in writing. In the event that the owner's request is granted, arrangements will be made for a copy of the requested data to be obtained by the owner. If the request is denied, the owner will be directed to Rule 41(g), Federal Rules of Criminal Procedure.

## IDENTIFICATION AND EXTRACTION OF RELEVANT DATA

d. A forensic image is an exact physical copy of the hard drive or other media. After obtaining a forensic image, the data will be analyzed to identify and extract data subject to seizure pursuant to this warrant. Analysis of the data following the creation of the forensic image can be a highly technical process requiring specific expertise, equipment, and software. There are literally thousands of different hardware items and software programs, and different versions of the same program, that can be commercially purchased, installed, and custom-configured on a user's computer system. Computers are easily customized by their users. Even apparently identical computers in an office environment can be significantly different with respect to configuration, including permissions and access rights, passwords, data storage, and security. It is not unusual for a computer forensic examiner to have to obtain specialized hardware or software, and train with it, in order to view and analyze imaged data.

e. Analyzing the contents of a computer or other electronic storage device, even without

19

significant technical issues, can be very challenging. Searching by keywords, for example, often yields many thousands of hits, each of which must be reviewed in its context by the examiner to determine whether the data is within the scope of the warrant. Merely finding a relevant hit does not end the review process. The computer may have stored information about the data at issue: who created it, when and how it was created, downloaded, or copied, when it was last accessed, when it was last modified, when it was last printed, and when it was deleted. Sometimes it is possible to recover and entire document that was never saved to the hard drive if the document was printed. Moreover, certain file formats do not lend themselves to keyword searches. Keywords search text. Many common electronic mail, database, and spreadsheet applications do not store data searchable text. The data is saved in a proprietary non-text format. Documents printed by the computer, even if the document was never saved to the hard drive, are recoverable by forensic programs but not discoverable by keyword searches because the printed document is stored by the computer as a graphic image and not as text. Similarly, faxes sent to the computer are stored as graphic images and not as text. In addition, a particular relevant piece of data does not exist in a vacuum. To determine who created, modified, copied, downloaded, transferred, communicated about, deleted, or printed the data requires a search of other events that occurred on the computer in the time periods surrounding activity regarding the relevant data. Information about which user had logged in, whether users share passwords, whether the computer was connected to other computer or networks, and whether the user accessed or used other programs or services in the time period surrounding events with the relevant data can help determine who was sitting as the keyboard.

f.   It is often difficult or impossible to determine the identity of the person using the computer when incriminating data has been created, modified, accessed, deleted, printed, copied, uploaded, or downloaded solely by reviewing the incriminating data. Computers generate substantial information about data and about users which generally is not visible to users. Computer-generated data, including registry information, computer logs, user profiles and passwords, web-browsing

20

history, cookies, and application and operating system metadata, often provides evidence of who was using the computer at a relevant time. In addition, evidence such as electronic mail, chat sessions, photographs and videos, calendars, and address books stored on the computer may identify the user at a particular, relevant time. The manner in which the user has structured and named files, run or accessed particular applications, and created or accessed other, non-incriminating files or documents, may serve to identify a particular user. For example, if an incriminating document is found on the computer but attribution is an issue, other documents or files created around that same time may provide circumstantial evidence of the identity of the user that created the incriminating document.

g.   Analyzing data has become increasingly time-consuming as the volume of data stored on a typical computer system and available storage devices has been mind-boggling. For example, as single megabyte of storage space is roughly equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is roughly equivalent of 500,000 double-spaced paged of text. Computer hard drives are now being sold for personal computers capable of storing up to 2 terabytes (2,000 gigabytes) of data. And, this data may be stored in a variety of formats or encrypted (several new commercially available operating systems provide for automatic encryption of data upon shutdown of the computer). The sheer volume of data also has extended the time that it takes to analyze data. Running keyword searches takes longer and results in more hits that must be individually examined for relevance. And, once reviewed, relevant data leads to new keywords and new avenues for identifying data subject to seizure pursuant to the warrant.

h.   Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including the use of hashing tools to identify evidence subject to seizure pursuant to this warrant, and to exclude certain data from analysis, such as known operating system and application files. The identification and extraction process may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within one-hundred and twenty (120) days from the data of seizure pursuant to this

21

warrant, absent further application to this Court.

      i.    All forensic analysis of the imaged data will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

**GENUINE RISK OF DESTRUCTION OF DATA**

      j.    Based upon my experience and training, and the experience and training of other Agents with whom I have communicated, it is not uncommon for technically sophisticated criminals to use encryption, programs to destroy data that can be triggered remotely or by a pre-programmed event or keystroke and sophisticated techniques to hide data.

**PRIOR ATTEMPTS TO OBTAIN DATA**

      k.    The United States has not attempted to obtain this data by other means.

**VI. CONCLUSION**

Based on the foregoing, there is probable cause to believe that Title 18 United States Code, Sections 922 (a) (1)(A), 922 (t), and 371 have been violated, and that the property, evidence, fruits and instrumentalities of these offenses, more fully described in Attachment B of this Affidavit, are located at the TARGET LOCATIONS, described in Attachments A(1), A(2), A(3), and A(4). I respectfully request that this Court issue a search warrant for the TARGET LOCATIONS, authorizing the seizure and search of the items described in Attachments B.

//

//

//

//

//

//

22

## REQUEST FOR SEALING

It is further respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant. I believe that sealing this document is necessary because the items and information to be seized are relevant to an ongoing investigation into criminal activity, and not all of the targets of this investigation are aware that they are being investigated for federal crimes. Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

Bureau of Alcohol, Tobacco, Firearms, and Explosives

Subscribed to and sworn before
me this ___ day of March 14, 2014.

THE HONORABLE BERNARD G. SKOMAL
UNITED STATES MAGISTRATE JUDGE

23

## ATTACHMENT A(1)

### PREMISES TO BE SEARCHED



The TARGET LOCATION-1 is located at **206/208 N. Freeman Street, Oceanside, Califonria 92054, in the County of San Diego, California.** The business is described as a commercial building located within a strip of commercial buildings. The facing is red brick with white framed windows. There is a shingled overhang. There is a black sign with "Ares Armor" printed it hanging over the door with number the number "208" affixed to it. Space "206" is located directly next door. The door contains a "206" and Ares Armor decals.

The search shall include all rooms, attics, crawl spaces, computers, electronic storage devices, safes, briefcases, storage areas, containers, garages, sheds, and containers such as safes, vaults, file cabinets, drawers, luggage, briefcases, valises, boxes, cans, bags, trash cans and other vehicles located on or near the premises, that are owned or under the control of ARES ARMOR or LYCUGRAN Inc.,

## ATTACHMENT A(2)

### PREMISES TO BE SEARCHED

TARGET LOCATION-2 is located at 416 National City Blvd, Unit B, National City, CA, located on the west side of National City Blvd. Unit B is located on the north side of a single story duplex. The building is described as a tan building with a glass front and a flat roof. The storefront has a welcome mat with "Ares Armor" printed on the mat and the Ares Armor logo decal is placed on the glass front. The number "416" is affixed to the entry door on the north unit of the duplex.

The search shall include all rooms, attics, crawl spaces, computers, electronic storage devices, safes, briefcases, storage areas, garages, sheds, carports, storage facilities and containers such as safes, vaults, file cabinets, drawers, luggage, briefcases, valises, boxes, jewelry boxes, cans, bags, purses, trash cans and other vehicles located on or near the premises, that are owned or under the control of ARES ARMOR or LYCUGURAN Inc.

## ATTACHMENT A(3)

### PREMISES TO BE SEARCHED



TARGET LOCATION-3 is Ares Armor warehouse location located at 180 Roymar Street, Suite D, Oceanide Califonria, 92058. The location is described as a commercial building located within a commercial area. It is a multi-business building and can be described as single story and white in color. Suite D is the fourth glass entry door from the west on the south side of the building. The letter "D" is affixed above the entry door on the south side of the building.

The search shall include all rooms, attics, crawl spaces, computers, electronic storage devices, safes, briefcases, storage areas, containers, garages, sheds, and containers such as safes, vaults, file cabinets, drawers, luggage, briefcases, valises, boxes, cans, bags, trash cans and other vehicles located on or near the premises, that are owned or under the control of ARES ARMOR or LYCUGRAN Inc.,

## ATTACHMENT A(4)

### PREMISES TO BE SEARCHED



TARGET LOCATION-4 is the previous location of Ares Armor Metal Works, LLC, located at 2420 Industry, Suite A, Oceanside, CA. The location is described as a large commercial building, located on the north side of Industry Avenue. It is a multi-business building and can be described as tan in color with lighter colored trim. The numbers "2420" appears on the façade above the door. The space associated with Ares Armor is accessed through the regular sized door (that is closed) on the left in the picture listed above, closest to the stairs.

The search shall include all rooms, attics, crawl spaces, computers, electronic storage devices, safes, briefcases, storage areas, garages, sheds, carports, storage facilities and containers such as safes, vaults, file cabinets, drawers, luggage, briefcases, valises, boxes, jewelry boxes, cans, bags, purses, trash cans and other vehicles located on or near the premises, that are owned or under the control of ARES ARMOR or LYCUGURAN Inc.

## ATTACHMENT B

### ITEMS TO BE SEIZED

Authorization is sought to search for and seize items that constitute evidence, fruits, proceeds, and instrumentalities of violations of 18 U.S.C. § 922(a)(1)(A) (dealing of firearms without a license); 18 U.S.C. § 922 (t)(1) (failure to conduct background checks during firearms transfer); and 18 U.S.C. § 371 (conspiracy to commit the foregoing offenses), including:

1. Any firearm that does not have a lawful manufacturer stamp and serial number, any unregistered firearm (where registration is required by Title 26 of the United States Code), and variant lower receivers of any kind (including AR-15 variant lower receivers).

2. Any items pertaining to the possession, manufacture, or distribution of illegal firearms, including but not limited to, lower receivers, upper receivers, grips, stocks, magazines, trigger assemblies, and barrels for AR-15-style firearms.

3. Photographs developed and undeveloped and/or videotapes or DVDs/CDs of firearms and/or variant lower receivers, firearm transactions, firearm parts, large sums of money and/or co-conspirators and paperwork showing the purchase, storage, disposition, or dominion and control over any firearms, firearm parts, ammunition, or any of the items described in Attachment B.

4. Records, including electronically stored data, relating to the acquisition and distribution and repair of firearems and/or variant lower receivers, including but not limited to ATF Forms 4473, California Dealer Of Record Sale (DROS) records, books, receipts, invoices, notes, ledgers, and pay/owe sheets. The records should also include, but not be limited to, bank records, vendor lists, customer lists, mailings, and purchase invoices/receipts.

5. Personal telephone books, telephone records, telephone bills, address books, correspondence, notes, and papers containing names and/or telephone numbers that tends to establish communication between co-conspirators.

6. Correspondence to and from/or from actual or prospective customers or suppliers.

7. Evidence and records relating to the accumulation of proceeds derived from illegal firearms trafficking and manufacturing including, but not limited to, money order receipts, money transfer documents, bank records, and sales invoices/receipts.

8. Rental or lease agreements for storage units, safety deposit boxes, other storage locations, keys, combinations, and/or access codes for them.

9. Indicia of occupancy, residency, and/or ownership of the items noted above and of the premises, including but not limited to, papers, correspondence, canceled envelopes, canceled postcards, bills, and registration documents.

10. Any safes, locked cabinets, and/or other secured containers and/or devices at the locations identified in Attachments A-1, A-2, A-3, and A-4. Law enforcement shall be permitted to open such locked containers by force or through the use of a locksmith if necessary.