Scott A. McMillan, SBN 212506
Michelle D. Volk, SBN 217151
Sean E. Smith, SBN 288973
**The McMillan Law Firm, APC**
4670 Nebo Dr., Suite 200
La Mesa, CA 91941-5230
Tel. 619-464-1500 x 14
Fax. 206-600-5095

Attorneys for Petitioner,
Lycurgan, Inc.

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In the Matter of the Search of:<br><br>Ares Armor, 206/208 N Freeman St, Oceanside; Ares Armor, 416 National City Blvd; Ares Armor Warehouse, 180 Roymar St D; and 2420 Industry, Oceanside, CA<br><br>LYCURGAN, INC. d/b/a ARES ARMOR,<br>                Petitioner,<br>     vs.<br>BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES,<br>                Respondent. | CASE NO. 14-CV-1424 JLS (BGS)<br><br>**DECLARATION OF SCOTT A. McMILLAN IN SUPPORT OF PETITIONER LYCURGAN, INC.'S MOTION FOR ATTORNEY'S FEES PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 54(d) AND 28 U.S.C. SECTION 2412**<br><br>Judge: Hon. Janis L. Sammartino<br>Dept.: 4A<br>October 30, 2014<br>Time: 1:30 P.M. |

**DECLARATION OF SCOTT A. MCMILLAN**

I, Scott A. McMillan, declare as follows:

    1. I am counsel for Petitioner Lycurgan, Inc. ("Lycurgan") in the above captioned case, and if called before this court or any other court I could and would testify competently to the following from my own personal knowledge, except as to those matters I state on information and belief, and as to those matters I believe them to be true.

2. This declaration is made in support of Lycurgan's motion for attorney's fees pursuant to Federal Rule of Civil Procedure 54(d) and 28 U.S.C. section 2412.

**BACKGROUND OF THIS CASE**

3. On March 14, 2014, the Respondent United States ("the Government") obtained a search warrant under seal to search Lycurgan's four leased real estate properties located at: (1) 206/208 N. Freeman St., Oceanside, CA 92054; (2) 416 National City Blvd., Unit B, National City, CA; (3) 180 Roymar St., Suite D, Oceanside, CA 92058; and (4) 2420 Industry, Suite A, Oceanside, CA.

4. On March 15, 2014, the Government executed the search warrant, and numerous agents from the Bureau of Alcohol, Tobacco, Firearms and Explosives ("BATFE") swarmed Lycurgan's business properties. During its search, the BATFE seized and carried away a large number of polymer castings, among a multitude of other lawfully owned items that are necessary for the functioning of the business. The raid occurred just days after Lycurgan filed a complaint against the Government for deprivation of Civil Rights, styled as *Lycurgan, Inc. v. B. Todd Jones*.

5. During the raid of Lycurgan at 2420 Industry, Oceanside, CA, BATFE agents extended its search and seizure to Lycurgan's private parking lot. The agents looked inside vehicles, including one that belonged to Tyler Hughes ("Mr. Hughes"), a subtenant of Lycurgan. The agents demanded Mr. Hughes to open his vehicle. Under duress, Mr. Hughes complied. The agents then demanded Mr. Hughes to open a locked box inside his vehicle. Again, under duress, Mr. Hughes complied. The box contained certain gun parts. The BATFE agents seized the items, which lead to criminal charges filed against Mr. Hughes by the San Diego District Attorney's Office. Mr. Hughes plead guilty to a criminal charge without the benefit of examining the purported basis for "probable cause" in the search and seizure of his vehicle.

6. On March 27, 2014, the BATFE mailed a "NOTICE OF SEIZURE AND ADMINISTRATIVE FORFEITURE PROCEEDING" to Mr. Karras, in an attempt to withhold the seized items with an estimated value of $290,200.00. On April 5, 2014,

Lycurgan, through counsel, filed a verified claim, contesting the forfeiture and requesting the initiation of a judicial proceeding to challenge such forfeiture.

7. On June 11, 2014, Lycurgan filed this action against the Government to unseal the search warrant affidavit ("Affidavit"). Lycurgan's motivation for seeking access to the Affidavit was to determine whether it contained probable cause to support the search and seizure. Lycurgan held a good faith belief that the Government submitted misrepresentations to the reviewing Magistrate regarding the manufacturing process and characteristics of the seized items.

8. On July 3, 2014, the BATFE informed Mr. Karras it was no longer pursuing forfeiture but would continue to retain Lycurgan's property.

9. On July 10, 2014, the Government filed an opposition to Lycurgan's motion to unseal the Affidavit.

10. On July 17, Lycurgan filed a reply in support of its motion to unseal the Affidavit.

11. On July 31, 2014, a hearing was held on Lycurgan's motion to unseal the Affidavit. Andrew Haden appeared on behalf of the Government. Mr. Karras and Scott McMillan appeared on behalf of Lycurgan. Tyler Hughes was also present. Both parties presented oral argument.

12. At the July 31, 2014 hearing, the Government raised some concern for officer safety due to Lycurgan's possession of a life-size cut-out of an agent and the delivery of pizzas to some agents. Petitioner addressed these concerns in the briefing and orally at the hearing, reassuring that neither act was done as a threat or with any ill-intentions. Andrew Haden, counsel for the Government, admitted that "Special Agent Geerdes has spoken highly of [Mr. Karras]."

13. During oral argument in this matter, the Court questioned the Government about the applicability of *Times Mirror Co.* in this Fourth Amendment case. The Government sidestepped the question by contending that this case is moot because the Government is no longer pursuing the civil forfeiture proceeding. The Government

1 repeatedly resorted to this same argument in response to other questions from the Court.
2 The Court disagreed with the Government that the withdrawal of the civil forfeiture
3 mooted this case.

4   14.  At the conclusion of the hearing, the Court indicated that the Government
5 failed to meet its burden in demonstrating and supporting a compelling governmental
6 interest to continue sealing the Affidavit.  Nevertheless, the Court allowed the
7 Government to submit supplemental briefing to substantiate its position to keep the
8 Affidavit sealed.

9   15.  On August 14, 2014, the Government declined to offer further support for its
10 position, and instead, disclosed a slightly redacted version of the Affidavit.  A review of
11 the Affidavit confirmed Lycurgan's belief that it contained misrepresentations, material
12 omissions, and a lack of probable cause, which formed the basis for a *Bivens* action that
13 Lycurgan recently submitted for filing through a motion for leave to file a supplemental
14 complaint.

15   16.  On August 21, 2014, the Court entered a judgment, dismissing the case as
16 moot.  Lycurgan filed a motion for new trial.  On September 19, 2014, Lycurgan filed a
17 protective notice of appeal, which the Ninth Circuit Court of Appeals received on
18 September 22, 2014.  Lycurgan filed the appeal on the basis that a judgment on the
19 merits is necessary because the issue is capable of repetition, yet evading review.
20 Notwithstanding the appeal, the outcome of this action is final as Lycurgan's review of
21 the Affidavit can never be reversed or otherwise changed.  Lycurgan does not seek any
22 fees or costs associated with the appeal in this motion, and will not seek duplicative fees
23 or costs in the future.

## PROFESSIONAL BACKGROUND OF PETITIONER'S COUNSEL

25   17.  On October 15, 2001, I founded The McMillan Law Firm, APC ("the Firm"),
26 as a professional corporation registered with the California State Bar.  The Firm is
27 generally devoted to commercial, employment, real estate, and civil rights litigation.
28   18.  I have had extensive experience in litigation, including business disputes,

both as a lay person and as a lawyer.  From 1991 to 2001, I worked for my father, attorney James I. McMillan, as a law clerk.  In that capacity, I participated in the prosecution of more than ten lawsuits.  Prior to becoming an attorney, I assisted in the presentation of three civil jury trials; two in Municipal Court, and one in the United States District Court for the Southern District of California.

19. Since becoming a licensed attorney, I have participated in more than eighteen jury trials, sixteen as lead trial attorney, and a similar number of bench trials.  I have also represented appellants and appellees in a number of appeals.  Four of my appellate cases have resulted in published opinions: *Thomas v. Fry's Elecs., Inc.* (9th Cir. 2005) 400 F.3d 1206; *Lytwyn v. Fry's Electronics, Inc.* (2005) 126 Cal.App.4th 1392; and *Bivens v. Gallery Corp*. (2005) 134 Cal.App.4th 847, and *Chaker v. Mateo* (Oct. 4, 2012) 209 Cal.App.4th 1138.  (*Lytwy,* and *Gallery Corp* were later de-published because the California Supreme Court granted petitions for review.)  *Thomas* and *Chaker* are published opinions regarding anti-SLAPP law, which have been followed or cited in later decisions.

20. Professional Certifications

**National Institute for Trial Advocacy ("NITA")**

a. **NITA "Advocate"**

On January 3, 2012, I earned my Advocate Designation with the National Institute of Trial Advocacy (NITA). The National Institute for Trial Advocacy (NITA) is a 501(c)(3) not-for-profit organization based in Boulder, Colorado. NITA pioneered the legal skills "learning-by-doing" methodology over 40 years ago. NITA is a dedicated team of professors, judges and practicing lawyers who believe that skilled and ethical advocacy is a critical component of legal professionalism and all systems of dispute resolution that seek justice. NITA's stated "Mission" is to promote justice through effective and ethical advocacy, train and mentor lawyers to be competent and ethical advocates in pursuit of justice, and develop and teach trial advocacy skills to support and promote the effective and fair administration of justice. In order to obtain the Advocate

Designation, one must complete the "NITA Advocate Program", which includes completion of intense workshops entitled "Building Trial Skills," "Deposition Skills," plus an elective. Building Trial Skills was an intense six day program. Deposition Skills was a three day program. As an elective, I took the course "Articulate Advocate," a two day program.

      b.    **NITA "Master Advocate":**

On January 3, 2013, I received the designation as "Master Advocate" by NITA. In order to be so designated, I was required to complete the course "Advanced Advocacy." Advanced Advocacy is yet another intense six day program. The course was presented in the US District Court in Washington D.C. and Georgetown University Law School. As part of the NITA Master Advocate Program, I also participated in the "Advocacy Teacher Training" in New York City. Teacher training required three days of further workshop style attendance.

      **Board Certification**

      c.    **National Board of Trial Advocacy ("NBTA")**

On November 20, 2012, I became a "Board Certified Advocate" with the National Board of Trial Advocacy ("NBTA"). The National Board of Trial Advocacy Division of the National Board of Legal Specialty Certification was the first American Bar Association accredited attorney board certifying agency in the world. Founded in 1977, NBTA offers board certification for Trial Lawyers, Criminal Lawyers, and Family Lawyers. To qualify for the certification lawyers must have extensive experience in their specialty and meet rigorous objective quality standards. The NBTA Standards for Certification require "good standing" and active practice for the required period of time. NBTA also requires "substantial involvement" in civil litigation including active participation in at least 100 contested matters. NBTA's certification also requires that the applicant demonstrate substantial participation in continuing legal education and the development of the law with respect to Civil Trial law. I was also required to participate in a peer review process by submitting by references, and then the Board made other

inquiries into members of the legal community. The NBTA required me to submit samples of my written advocacy as well. Finally, I sat for a one day, written examination on civil litigation and ethics, which I passed. To maintain that certification I am required to demonstrate continuing education and lack of any allegations of misconduct.

d. **California Board of Legal Specialization (Appellate Law)**

I was informed on February 28, 2012, that I passed the October 2011 examination for Civil-Appellate Specialization. On March 4, 2013, I submitted my application for the certification. On September 1, 2014, the State Bar approved my long-pending application for Certification as an Appellate Law Specialist. This specialization required me to make a showing that I had practiced appellate law for at least 25% of the time in the immediately preceding five years.

21. **Successful Jury Trials.**

Over the course of my career, I have obtained several high-dollar judgments, as well as defense verdicts.

a. *Mancinelli v. Siewak*. I obtained a judgment of $952,000 for my client Ozzie Mancinelli in *Mancinelli v Siewak, et al.* (S.D. Sup. Case No. GIC805629), a dispute over an oral contract for an interest in a doll manufacturing business. I proved that my client was fraudulently induced to leave his well paying job to work for the defendants for less money, but with the promise of prestigious title of CEO and a 10% interest in the company. Of course, my client was never provided any shares of the business and was later fired without receiving a final paycheck.

b. *Cervantes v. Molina*. Another successful jury trial was in *Cervantes v Molina, et al.*, S.D. Sup. Case No. 37-2008-00099038-CU-BC-CTL. I obtained a jury verdict of $1,225,200 on claims against Defendant Molina for breach of contract and false promise involving the sale of a dental practice. In addition, the jury found that Molina acted with malice and fraud, so much so that the damages awarded consisted of $900,000 in punitive damages.

c. *Harris v. Menifee Lakes Master Association*. In *Don Harris v. Menifee*

*Lakes Master Association*, I represented Don Harris as Cumis Counsel. An original complaint had been filed by Don Harris in 2006 against Menifee Lakes Master Association (MLMA). MLMA filed an initial cross-complaint but amended it several times to add claims as they were "discovered." Harris was sued by MLMA based on his work as a manager at the pool facility operated by MLMA. MLMA sued for damages under theories of breach of contract, implied covenant of good faith and fair dealing, fraud, conversion, money received and money paid by mistake. After the initial cross-complaint was filed, the parties agreed to a mediation involving the remaining MLMA case in which the insured was still a plaintiff against the lake company. At the time of mediation, MLMA claimed its damages were approximately $450,000. As a result of mediation, a settlement of $135,000 was offered to MLMA, who made counter-settlement demands in excess of $200,000. On behalf of Mr. Harris, we served a Statutory Offer (CCP Section 998) of $100,000. The case became very emotionally charged by the time it went to trial. The damages claimed arose mainly from Harris' work as the pool manager over the years and the association sought to make a claim against him for a wide variety of pool and equipment claims. The case commenced trial on July 15, 2011, and the jury verdict, after 1.5 days of deliberation, came in on August 4, 2011. The total jury verdict for Menifee Lakes Master Association (MLMA) was $41,266 — less than 10% of the amount they presented to the jury.

22. In this case, Lycurgan paid fees at an hourly rate. The Firm defended Lycurgan, where there was no potential to recover a contingency fee, and knowing that Lycurgan, at any time, may become financially unable to fully compensate the Firm for its legal services. After all, Lycurgan has been the subject of much Government scrutiny. Many of the cases the Firm accepts are paid on a full or partial contingent basis, and many of them involve potentially large judgments, but also commensurately large costs and risks of non-payment for the Firm's work. The Firm takes a large number of indigent clients who require fee waivers to pursue their claims. In those instances where I have not been able to secure a favorable judgment for my client, the Firm has

1  received no compensation for large amounts of work, or reimbursement for the expenses
2  it has incurred. The Firm's ability to represent clients who are otherwise unable to pay
3  for legal services depends upon receiving substantial fee awards in cases in which we are
4  successful.

<u>Risk Involved in Taking the Case and Preclusion of Other Work</u>

23. The McMillan Law Firm is a small firm which, at the time of taking and prosecuting this action, consisted of only myself, two young associate attorneys, and a legal assistant. The risk involved in accepting the case, in light of the Government's possession of substantially more resources, was very high. Lycurgan was not in a position to pay the full rate of legal fees associated with the case, and there was no potential for a contingency fee agreement. I have not billed Lycurgan for all of the time that I have devoted to its cause. There is no larger organization funding the defense of Lycurgan. Nevertheless, the Firm accepted the risk inherent in any case, and the cost of litigation.

24. On August 14, 2014, the Government unsealed a slightly redacted version of the Affidavit. A true and correct copy of the Affidavit is attached hereto as **Exhibit "A."** On August 21, 2014, this Court ordered the case dismissed as moot because Lycurgan had achieved its objective. A true and correct copy of this Court's judgment is attached hereto as **Exhibit "B."** This decision makes Lycurgan the prevailing party under 28 U.S.C. section 2412 (Equal Access to Justice Act).

<u>Work Performed</u>

25. The Firm's efforts achieved positive results.

    a.  <u>Informal request to review the Affidavit, and observance of the raid (6.5 hours)</u>. On Saturday, March 15, 2014, I received a text message from Dimitrios Karras, a shareholder and the CEO of my client, Lycurgan: "ATF is executing a search warrant." I understood from that message that Agents purportedly from the Bureau of Alcohol, Tobacco, Firearms and Explosives ("BATFE") were raiding Lycurgan's four business locations in

Oceanside and National City, California. Mr. Karras requested me to come to his Oceanside facilities to monitor the raid and be available to provide legal assistance. At that time I was working at my office in La Mesa. I stopped work and took a 45 minute drive up to Oceanside. Also attending the raid were three colleagues: Sean Smith, Esq., Sandy Meade, Esq. and Bryan Rho, also members of the California Bar. Lycurgan has three facilities in Oceanside. On arriving in Oceanside, I dropped Ms. Meade off at Lycurgan's shipping location at 180 Roymar Road, Oceanside, CA 92058. Then, Mr. Smith and I went to the Ares Armor Oceanside Retail Shop at 206/208 N. Freeman Street, Oceanside CA 92054. There, I asked one of the Agents to see the search warrants and the supporting affidavit. The Agents provided me copies of the search warrants, but refused to show me the affidavit that was filed under seal. **<u>I am seeking costs and expenses for only my time</u>** (NOT any of the time of my colleagues who accompanied me) in driving up to Oceanside, and informally requesting to see the search warrant affidavit. I remained on the premises to observe the raid, and I included many of my observations in Lycurgan's motion to unseal the search warrant affidavit.

b. <u>Motion to unseal the Affidavit (99.8 hours)</u>. Following the raid, the Firm began researching and preparing the motion to unseal the Affidavit. We researched the issues surrounding the execution of the search and seizure, the arrest and charges of Tyler Hughes (a subtenant of Lycurgan) arising from the search and seizure, and the civil forfeiture proceeding initiated by the Government to retain the seized items. I gathered information from Peter Liss, Alan Beck, and consulted with my client regarding the damages suffered and strategy in seeking to unseal the Affidavit. I also conducted substantial research into the character and manufacturing of the seized items, as well as prior interpretations of the items as reported by the

Government. I, and my colleague, Sean E. Smith, prepared the motion and supporting documents to unseal the Affidavit. Mr. Smith visited the U.S. Courthouse, Judge Skomal's chambers, and the Clerk's office in efforts to docket the Motion, but was rebuffed everywhere he went. Mr. Smith attempted to serve the U.S. Attorney's Office a copy of the Motion, but was again rebuffed. I called Andrew Haden at the U.S. Attorney's Office, and Trish Lopez at the U.S. District Court to work out the docketing and service of the Motion. Eventually, we succeeded in filing the Motion and scheduling a hearing date. On July 10, 2014, we received and analyzed the Government's opposition. We then filed a response.

    c. <u>Preparation for, and presentation of, oral argument. (6.5 hours)</u>. On July 31, 2014, I attended the hearing on this matter, and presented oral argument. Mr. Karras and Tyler Hughes were also present. On August 14, 2014, the Government ceded and unsealed a lightly redacted version of the Affidavit. The favorable outcome reinforces the quality of the work-product by the Firm in this action, and supports an award of the attorney's fees and costs incurred to prevail.

    d. <u>Review/analysis and response to the unsealed redacted Affidavit. (8.95 hours)</u>. On August 14, 2014, the Government filed a 30-page search warrant Affidavit. The names of the investigating agents were redacted. The Government also filed a "supplemental brief" that suggested the disclosure of the redacted Affidavit mooted this case. I, and my colleague, reviewed and analyzed the Affidavit. We also researched the law concerning "mootness," and consulted with our client about how to respond. Upon our advice and agreement of our client, we prepared a response to the Government's "supplemental brief," contending that the issue is not moot because it is capable of repetition, yet evading review. Just prior to filing this response, the Court entered a judgment that

1  dismissed this case as moot because Petitioner achieved its goal of gaining
2  access to the Affidavit. We then modified our response and filed it as a
3  motion for a new trial under Federal Rule of Civil Procedure 59(a).

26. As with the motion to unseal the Affidavit, the preparation of the motion for attorneys' fees in this case has consumed a substantial amount of time. Three attorneys at The McMillan Law Firm worked on this case, including Michelle D. Volk, Sean E. Smith and myself, along with support staff, and all the time entries for these employees had to be compiled and classified into categories of compensable and non-compensable work.

27. My usual and customary fee for the purpose of lodestar request is $500.00, and that of the Firm's junior attorneys are $325.00 for Michelle Volk's time and $275.00 for Sean Smith's Time. I am informed and believe that these rates reflect, if not understate, the prevailing rates charged by attorneys of similar skill and experience in the relevant community at the time of the delivery of the services.

28. The National Law Journal's survey of billing rates of the largest U.S. law firms provides the High and Low rates for partners and associates, of which a true and correct copy is attached hereto as **Exhibit "C."** The foregoing rates are consistent with the rates in the market for attorneys in the geographic area for 2011 and 2012.

29. Specifically, I have received more than a court-ordered fee award for an amount in excess than $500.00 per hour, if based on a per hour charge. For example, in 2006, the United States Bankruptcy Court for the Southern District of California awarded me fees for my work in a contingency case on behalf of a Chapter 7 Trustee, involving the recovery of assets fraudulently transferred from the bankruptcy estate. If calculated on an hourly basis, my rate for that work exceeded $900.00.

30. In addition, after obtaining a jury verdict and entry of judgment in favor of my client Sean Ryan, I participated in the reorganization case of *In re IDEARC INC., et al.*, Case No. 09-31828 (BJH), in the United States Bankruptcy Court for the Northern District of Texas. As a result of the Firm's efforts, Judge Barbara Houser awarded us

substantial contribution fees and expenses in April, 2010. At that time, more than four years ago, the Court accepted $450.00 as my reasonable hourly rate, and approved a total fee award of $400,000.00.

31. In addition, in January 2012, based on a successful anti-SLAPP motion in the case *Tri-City Health Care District v. Sterling*, San Diego Superior Court, Case No. 2011-00052050, Judge Maas, III awarded me an hourly rate of $450.00. A true and correct copy of that fee award is attached hereto as **Exhibit "D".**

32. Most recently, on March 22, 2013, Judge Taylor awarded me fees of $500 per hour in *Chaker*. A true and correct copy of the confirmed minute order is attached hereto as **Exhibit "E."**

33. In this motion for fees, I am asking that my time and the time of the attorneys employed by The Firm be compensated at the modest statutory rate of $189.78 per hour pursuant to 28 U.S.C. section 2412(d)(2)(A)(ii), while also taking into account the "cost of living" adjustment.[1] Although paralegal time may be compensated at the same rate as attorney time pursuant to *Richlin Sec. Serv. Co. v. Chertoff* (2008) 553 U.S. 571, 590, we are nevertheless requesting a proportionally smaller rate for the Firm's paralegals, calculated at $85.00 per hour. These rates, particularly those of the Firm's attorneys, are substantially underestimated. However, due to the statutory cap on attorney's fees imposed by section 2412(d)(2)(A)(ii), we cannot request our usual and customary rate, which far exceeds the rate requested herein.

---

[1] The figure is calculated by taking the "HALF1" CPI rate for 2014 and subtracting from it the March 1996 rate (236.384 - 155.7 = 80.684) and then dividing that number by the March 1996 rate (80.684 / 155.7 = 0.5182). These calculations result in the cost-of-living percentage increase from March 1996 through June 2014. The cost-of-living percentage increase is then applied to the statutory rate of $125.00 to derive the adjusted hourly rate permitted by the EAJA ((0.5182 × 125) [*4] + 125 = 189.78). See Department of Labor, Bureau of Labor Statistics, available at http://data.bls.gov/cgi-bin/surveymost?bls (check box next to "CPI for All Urban Consumers (CPI-U) 1982-84=100" and click on "Retrieve data" button) (last visited Aug. 13, 2014). See, *Beard v. Comm'r of Soc. Sec.*, 2014 U.S. Dist. LEXIS 120380, 3-4 (M.D. Fla. Aug. 13, 2014.)

a. <u>Michelle D. Volk</u>. Michelle Volk is employed by the Firm. I am informed and believe that Ms. Volk earned an undergraduate degree in Urban Studies & Planning from the University of California at San Diego in 1997 where she earned departmental honors. She then obtained a law degree from California Western School of Law in 2001. Since graduating from law school, Ms. Volk has primarily practiced civil litigation. For approximately two years she defended professional negligence cases, mostly medical malpractice. The remainder of her career she handled business litigation cases. She has co-chaired two jury trials and has prepared numerous other cases for trial.

b. <u>Sean E. Smith</u>. Sean Smith is employed by the Firm. As to Mr. Smith I am informed and believe that he was formerly employed as a Judicial Law Clerk to Presiding Judge Robert C. Naraja of the Superior Court of the Northern Mariana Islands, Saipan, between November 14, 2011 and August 8, 2013. Mr. Smith graduated 9th in his class of 210, *Magna Cum Laude*, from Thomas Jefferson School of Law in Spring of 2011.

c. Paralegals:

    i. <u>Michaele Kanczel</u>. Michaele Kanczel is employed by the Firm as a legal assistant. I am informed and believe that Ms. Kanczel is currently a 1L Law Student at California Western School of Law. She attended California State University San Bernardino upon receiving the Presidential Academic Excellence Scholarship, a full tuition scholarship awarded to the top 1% of graduating class, and graduated with a B.A. in Criminal Justice in June of 2014.

    ii. <u>Olga Bresheva</u>. Olga Bresheva was formerly employed by the Firm as a legal assistant. I am informed and believe that Ms. Bresheva earned a Diploma with Honors from Penza State Pedagogical University in Russia in 2010. She is currently enrolled at Coleman University in the United States, seeking an MBA.

34. It is the normal practice and custom of the attorneys and staff of the Firm to maintain daily records of legal services performed. The Firm has kept detailed records reflecting the time spent in this case as part of an overall Firm management policy. Professional employees of the Firm have been required to provide daily reports of their time and expenses incurred. Those times are inputted into the system. I myself keep contemporaneous notes on my computer, in e-mails to myself, and through my phone system. The records are ultimately put into our computerized billing system.

35. To prepare this declaration, I have personally reviewed the computerized time records. The billing report is useful only as a reflection of the tasks completed and the time that it took to complete those tasks. The billings provided to this Court represents a good faith submission of the time necessarily spent representing Lycurgan in this case. The billing records are only as to the Firm's efforts in unsealing the search warrant Affidavit. All records relating to other work concerning the representation of Lycurgan, have been segregated. These billings only reflect part of the time spent on Lycurgan's case, as certain time went unrecorded or was voluntarily reduced. The value of the services provided is detailed in the table attached to the Memorandum. A true and correct copy of the report generated by this system, for the time spent on this case, is attached hereto as **Exhibit "F."**

36. I estimate that I will spend an additional twelve hours to finalize the fee motion, review the Government's opposition and draft the reply, plus an additional four hours preparing for and appearing at the hearing for this fee motion. Thus, the time that I reasonably expect to incur in the future to complete this matter is sixteen hours.

/ / /

/ / /

37. We request that the Court award the amount of $24,516.00 as reasonable fees attributable to the efforts of the McMillan Law Firm, APC, pursuant to 28 U.S.C. section 2412. Plus, $3,036.48 for the reply, objections and appearance on the fee motion, for a total attorney's fee award of $27,552.48. The specifics of that computation are set forth in the tables beginning on the following page.

I declare under penalty of perjury according to the laws of the State of California that the foregoing is true and correct and that this declaration was executed on September 22, 2014, in the County of San Diego, State of California.

/s/ Scott A. McMillan

_____

Scott A. McMillan

**TABLE OF FEES REQUESTED THROUGH THIS MOTION**

**Briefing, Oral Argument, and Post-Oral Argument Efforts**

| Name of Professional | Hourly Rate | Hours Expended | Value of Services |
|---|---|---|---|
| Scott A. McMillan | $189.78 | 67.75 | $12,857.60 |
| Michelle D. Volk | $189.78 | 2.05 | $389.05 |
| Sean E. Smith | $189.78 | 57.50 | $10,912.35 |
| Michaele Kanczel | $85.00 | 2.1 | $178.50 |
| Olga Bresheva | $85.00 | 2.1 | $178.50 |
| | | | |
| TOTAL | | 131.50 | $24,516.00 |

Itemized Breakdown of Requested Fees

| | Scott McMillan | Michelle Volk | Sean Smith | Michaele Kanczel | Olga Bresheva |
|---|---|---|---|---|---|
| Informal Request for Affidavit/observance of the raid | 6.50 Hours $1,233.57 | 0 | 0 | 0 | 0 |
| Research (all) | 13.50 Hours $2,562.03 | 0 | 18.40 Hours $3,491.95 | 0 | 0 |
| Correspondence with client, counsel, and Court | 17.05 Hours $3,235.75 | 0 | 0.50 Hours $94.89 | 0 | 0 |
| Drafting/revising Motion | 7.90 Hours $1,499.26 | 0 | 15.60 Hours $2,960.57 | 0 | 0 |
| Scanning/filing/service/calendaring of Motion | 2.20 Hours $417.52 | 1.75 Hours $332.12 | 2.80 Hours $531.16 | 0.90 Hours $76.50 | 2.10 Hours $178.50 |
| Review/analyze Opposition | 1.60 Hours $303.65 | 0 | 1.30 Hours $246.71 | 0 | 0 |
| Drafting/revising Reply | 8.40 Hours $1,594.15 | 0 | 7.10 Hours $1,347.44 | 0 | 0 |

| Scanning/filing/ service of Reply | 0.50 Hours $94.89 | 0 | 0 | 0.20 Hours $17.00 | 0 |
| --- | --- | --- | --- | --- | --- |
| Preparation for hearing | 1.00 Hours $189.78 | 0 | 0 | 0.50 Hours $42.50 | 0 |
| Attendance at hearing | 2.50 Hours $474.45 | 0 | 2.50 Hours $474.45 | 0 | 0 |
| Review/analysis of search warrant affidavit | 0.30 Hours $56.93 | 0.15 Hours $28.47 | 0.50 Hours $94.89 | 0.50 Hours $42.50 | 0 |
| Response to Gov's unsealing of redacted affidavit | 2.50 Hours $474.45 | 0 | 5.10 Hours $967.88 | 0 | 0 |
| Fee motion | 3.80 Hours $721.16 | 0.15 Hours $28.47 | 3.70 Hours $702.19 | | |
| | | | | | |
| Total: | 67.75 Hours $12,857.60 | 2.05 Hours $389.05 | 57.50 Hours $10,912.35 | 2.10 Hours $178.50 | 2.10 Hours $178.50 |

**FEE MOTION - ANTICIPATED EFFORTS AND APPEARANCE**

| Name of Professional | Hourly Rate | Hours Expended | Value of Services |
| --- | --- | --- | --- |
| Scott A. McMillan | $189.78 | 16 (anticipated) | $3,036.48 |

**Total fees and expenses requested: $27,552.48**